**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: _____3/31/2022_____

---------------------------------------------------------------- x
**LA SHEA ROSE CLAYTON**,               :
                                        :
                          **Plaintiff,**  :
                                        :        **1:20-CV-4241-ALC**
            **-against-**                 :
                                        :        <u>**OPINION AND ORDER**</u>
**COMMISSIONER OF THE SOCIAL SECURITY**   :
**ADMINISTRATION**,                       :
                                        :
                          **Defendant.**  x
----------------------------------------------------------------

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff La Shea Rose Clayton brings this action challenging the Commissioner of Social Security's ("Commissioner" or "Defendant") final decision that Plaintiff was not entitled to Social Security disability insurance benefits ("DIB") under Title II and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, respectively. Before the Court are the Parties' cross-motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). Upon review of the submissions and for the reasons stated below, Plaintiff's motion is **DENIED** and Defendant's motion is **GRANTED**.

<u>**BACKGROUND**</u>

**I.    Procedural History**

On June 24, 2016, Plaintiff filed applications for DIB and SSI in connection with alleged disability beginning on November 15, 2015. R. at 10, 89, 191-200.[1] The Social Security Administration ("SSA") denied Plaintiff's disability claim on September 29, 2016. R. at 103-06. Plaintiff subsequently filed a written request for a hearing before an Administrative Law Judge

---

[1] "R" refers to the Certified Administrative Record. Pagination follows original pagination in the Certified Administrative Record.

("ALJ") on October 26, 2016. R. at 10. Plaintiff appeared before an ALJ, represented by counsel, on July 30, 2018 and March 11, 2019. R. at 32-58, 60-73.

On July 30, 2018, ALJ Kieran McCormack commenced a hearing. R. at 60. The ALJ postponed the hearing because Plaintiff's counsel testified that the documentary record was incomplete. R. at 64. A second hearing was held by video before the ALJ on March 11, 2019. R. at 10, 34. The ALJ presided over the hearing from White Plains, New York. *Id*. Plaintiff, who was represented by counsel, appeared and testified from Poughkeepsie, New York. *Id*. Vocational Expert Robert Baker ("VE") provided testimony. R. at 52-55. The ALJ rendered his decision on April 10, 2019, finding that Plaintiff was not disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act. R. at 24. Plaintiff requested review of the ALJ's decision on May 30, 2019, which was denied by the Appeals Council on April 8, 2020, making the ALJ's decision the final decision of the Commissioner. R. at 1-5; Compl. ¶ 9, ECF No. 1.

On June 3, 2020, Plaintiff filed the instant lawsuit. ECF No. 1. On February 1, 2021, Plaintiff moved for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure, requesting remand of this case for further administrative proceedings. *See* Plaintiff's Motion for Judgment on the Pleadings, ECF Nos. 12-13 ("Pl.'s Mot."). Defendant cross-moved for judgment on the pleadings on March 31, 2021. *See* Defendant's Motion for Judgment on the Pleadings, ECF Nos. 17-18 ("Def.'s Mot."). On April 12, 2021, Plaintiff submitted a reply memorandum in further support of her motion and in opposition to Defendant's motion. Plaintiff's Reply, ECF No. 19 ("Pl.'s Mot."). The Court now considers the Parties' motions.

## II.   Factual Background

### A.  Non-Medical Evidence

#### i.    Plaintiff's Background

Plaintiff was born on March 26, 1978. R. at 74. She has a GED and an associate degree in fashion designing and merchandising. R. at 46-47. She has past relevant work experience in retail at The Gap but reported that she was fired due to an altercation with another employee. R. at 40, 414. Prior to that, she worked as a teacher assistant at Leake & Watts and left in 2012 due to pregnancy. R. at 38-39.

ii.    Plaintiff's Hearing Testimony

Plaintiff testified that on a typical day she wakes up, brushes her teeth, washes her face, and helps her younger children get ready for school. R. at 47. On some days, Plaintiff would leave her home 20 to 30 minutes early to take the time needed to walk her children to the school bus at the end of the driveway. *Id*. On other days, Plaintiff's husband walks the children to the school bus. *Id*. Her children remain at home if she cannot walk them to the school bus due to pain and her husband is not around. R. at 50. On days where Plaintiff walks her children to the school bus, she returns home, may make herself breakfast (*e.g.*, cereal), and read or sit in the living room to watch a church program or another television show. R. at 48.

Plaintiff does not always eat lunch and sits to relax because taking her medication may cause her to become sick for 30 minutes to an hour. *Id*. Plaintiff can prepare meals such as spaghetti, hot dogs, burgers, broccoli, and salad. R. at 17. When her pain is too great, her husband prepares meals. *Id*. She may attempt to clean up her house by washing clothes and wiping down counters, however, her sister comes to clean her house once a week. *Id.* When Plaintiff's children return home from school, they eat a sandwich or cereal, watch television, do homework, and sleep. R. at 48. Plaintiff shops once a week for two hours but said she must take a break within the two-hour period to rest. R. at 17. Plaintiff does not sleep a full eight hours at

night due to her sleep apnea. R. at 49. Plaintiff has a driver's permit but has not obtained a license because she never took a road test. R. at 48.

Her alleged disability is a combination of sciatic nerve problems walking up and down stairs, sleep apnea, depression, lupus, and high blood pressure. Plaintiff was involved in a motor vehicle accident in 2010. R. at 41. She now has problems walking with pain that travels from her back and down her legs resulting in leg numbness and suffers from anxiety and depression. R. at 17, 50, 256. Plaintiff's shoulder and backside go numb suddenly during the day. *Id*. Plaintiff uses a stick to reach things and said her hands hurt a lot which causes her to drop items frequently. R. at 17. Plaintiff is allergic to certain foods and has bad stomach aches with constipation or diarrhea. R. at 50. Because of those problems, she stays home frequently and uses the bathroom often. R. at 51. Following the VE's testimony, Plaintiff testified that she is anemic due to heavy menstruation and would need to take time off during her week of menstruation. R. at 55-56. Plaintiff has been hospitalized for ovarian cysts in connection with this condition. *Id*. Plaintiff was diagnosed with high blood pressure, arthritis in her back, obstructive sleep apnea, lupus, fibromyalgia, depression, and post-traumatic stress disorder ("PTSD"). R. at 377, 528.

Plaintiff takes Tylenol for pain on the recommendation of her doctor. R. at 687. Plaintiff takes medication for her high blood pressure and uses a CPAP machine because of her sleep apnea diagnosis. R. at 507. Plaintiff was prescribed medication for her lupus diagnosis. R. at 436. Plaintiff falls asleep frequently with difficulty breathing and sometimes coughs or chokes while she is sleeping and wakes up multiple times at night to use the bathroom. R. at 49. Plaintiff sometimes has nosebleeds while she is sleeping which causes her to wake up. *Id.* Plaintiff bought a cane from a thrift shop because her Medicaid card does not cover a cane. R. at 51. Plaintiff uses

the non-prescribed cane to walk up the stairs in her house because her knees give out and she falls. *Id*.

   iii. Disability Reports

On August 2, 2016, Plaintiff submitted a Disability Report to the SSA indicating that she had stopped working on the alleged onset date of November 15, 2015 because of her conditions. R. at 226. Plaintiff reported that she did not work in 2014 because she was on maternity leave and that she normally took Tylenol for her pain. *Id.* at 233. She saw a doctor or other healthcare professional in the past or had future appointments scheduled for physical (not mental) conditions. R. at 229. In a second Disability Report dated October 27, 2016, Plaintiff reported that her medical conditions were ongoing and worse. R. at 260. She also stated that she had seen a doctor or other health professional in the past or had future appointments scheduled for both physical and mental conditions (including emotional or learning problems). R. at 261.

   iv. Function Report

Plaintiff's August 16, 2016 function report states that she takes care of her children, but that her husband and older son help with caretaking. R. at 237. Before her medical conditions she was able to walk, play sports with her children, wash dishes, clean her entire house, work full-time, flip, and dance. R. at 237. Her medical conditions negatively affect her sleep and her ability to engage in personal care (especially when she is in pain). R. at 237. Her conditions make it difficult to use the restroom, and she needs reminders to take medicine. R. at 239. Plaintiff cooks some meals, does laundry, and wipes counters, but cannot do house or yard work. R. at 239-40. She can drive and go shopping for essentials on her own. R. at 241.

   v. Vocational Expert Testimony – Robert Baker

Robert Baker testified as a Vocational Expert ("VE"). R. at 53-55. The ALJ described three hypothetical situations to the VE after questioning Plaintiff. R. at 52-55. The VE was then asked to determine whether an individual with the following limitations could be employed in the national economy:

> The individual can climb ladders, ropes, and scaffolds on an occasional basis. The individual can climb ramps and stairs, balance, bend, stoop, kneel, crouch and crawl on a frequent basis. The individual can reach in all directions, including overhead and with both arms on a frequent basis. Further, the individual can work at low stress jobs defined as jobs containing no more than simple, routine, and repetitive tasks, involving only simple, work-related decisions with few workplace changes and where there is only occasional interaction with supervisors, co-workers, and the general public.

R. at 52.

In response to this hypothetical, the VE testified the individual could perform light work as a collator operator, marker, and router. R. at 53. The ALJ posed a second hypothetical to the VE with the same conditions as the first, with no past relevant work, except under sedentary work. R. at 53-54. The VE testified that this individual could work as an addresser, stocker, and ampoule sealer. R. at 54. The VE said that the individual could only work at jobs that allow at least four absences from work each month in response to the third hypothetical. *Id.* In response to Plaintiff's counsel, the VE said all employment would be ruled out for an individual who was off-task 20 percent of the time in the first two hypotheticals given by the ALJ. R. at 55.

### B.  Medical Treatment

#### i.    The Heart Center

On November 25, 2015, the Heart Center reported an evaluation of Plaintiff's chest pain, worsening over the previous one to two years. R. at 501. Further tests were ordered and a high likelihood of obstructive sleep apnea was noted. R. at 503.

#### ii.   Vassar Brothers Medical Center ("Vassar Bros. ED")

On February 22, 2016, Plaintiff was seen at Vassar Bros. ED due to a dull, achy back pain radiating down both of her legs and a complaint of an inability to walk that was unrelieved by Tylenol. R. at 655. Plaintiff was diagnosed with back pain and discharged with Flexeril and Percocet. R. at 657. On March 9, 2016, Plaintiff was diagnosed with obstructive sleep apnea and nocturnal hypoxemia. R. at 528. On April 20, 2016, a sleep study confirmed that Plaintiff has obstructive sleep apnea. R. at 508. On September 4, 2016, Plaintiff was seen for an arm laceration with pain and bleeding due to an altercation. R. at 658. Plaintiff's X-rays showed normal and she was discharged with Keflex. R at 660-61. On December 21, 2016, Plaintiff was seen in the Emergency Department for three to four days due to dizziness with headaches, bilateral ear pain, and vomiting. R. at 754.

   iii. Digestive Disease Center ("DDC")

On November 13, 2018, Plaintiff was seen at DDC for abdominal pain and irregular bowel movements. R. at 683. DDC noted right upper quadrant pain on and off for three months, dull/aching, intermittent, worsening after meals, associated with nausea/vomiting. *Id*. Plaintiff's assessments included hematochezia, change in bowel habits, right upper quadrant pain, left lower quadrant pain and heartburn. *Id*. An irritable bowel syndrome was suspected. R. at 684-85. On January 15, 2019, Plaintiff was seen at DDC for follow-up testing. R. at 744.  Plaintiff's colonoscopy was significant for skin tags, external and internal hemorrhoids, and Plaintiff's EGD (esophagogastroduodenoscopy) was remarkable for 1 cm hiatal hernia and reflux esophagitis. *Id*. Plaintiff reported daily heartburn, regurgitation at night, intermittent nausea, bloating after meals, belching, daily abdominal pain, and constipation. *Id*. Plaintiff was diagnosed with reflux esophagitis, internal hemorrhoids, and periumbilical pain. R. at 745.

   iv. Hudson Valley Mental Health ("HVMH")

On September 2, 2015, a mental status assessment at HVMH revealed that Plaintiff was diagnosed with adjustment disorder with mixed anxiety. R. at 378. On September 9, 2015, a psychosocial assessment at HVMH noted Plaintiff had ongoing marital and family matters, anxiety, and difficult relationships. R. at 389. Her trauma history included sexual assault, physical abuse, a chaotic family life, and homelessness, which met the admission criteria. R. at 390, 394. Plaintiff missed two appointments after admission. On November 10, 2015, Plaintiff recited many family problems at home. R. at 413. On November 18, 2015, Plaintiff indicated she had gotten fired from her job at The Gap due to an altercation with another employee. R. at 414. On December 2, 2015, Plaintiff reported sleeping ten hours or more and continuing to feel tired. R. at 591. On December 9, 2015, Plaintiff reported struggling with making decisions and having her mind race all day and night. R. at 415. She mentioned a lack of motivation, inability to concentrate, unwillingness to get out of bed, inability to finish projects, unwillingness to do activities with friends, and constant tiredness. R. at 415-16. On December 29, 2015, Plaintiff described moderate to severe depressive symptoms. R. at 416.

Plaintiff continued her sessions at HVMH throughout 2016. Plaintiff's sessions took place on January 5, 2016; January 12, 2016; and January 25, 2016. R. at 416-17. Plaintiff discussed maltreatment by her family and a method of handling her treatment. *Id*. On February 25, 2016, Plaintiff reported recurrence of back problems and trouble sleeping. R. at 418-19. On March 1, 2016, Plaintiff discussed feeling terrible most days and sleeping frequently. R. at 419. A scheduled session on March 29, 2016 focused on Plaintiff's family issues and persistent anxiety. R. at 420. On April 12, 2016, Plaintiff took a sleep study. R. at 420-21.

Plaintiff was seen at HVMH on April 26, 2016 and May 25, 2016. R. at 421-22. Plaintiff then missed four appointments. R. at 423. On June 14, 2016, she discussed depressive symptoms

and failure to keep appointments; Plaintiff shared that she forgets appointments and was set up for reminder calls. R. at 599. On July 28, 2016, a treatment plan noted Plaintiff's poor attendance despite outreach. R. at 404. Plaintiff continued with a diagnosis of adjustment disorder with anxiety. R. at 408. On August 2, 2016, Plaintiff appeared for therapy at HVMH discussing chronicity of arthritis conditions, chronic pain that keeps her mood low, not engaging with friends, and withdrawing from activity due to her physical condition. R. at 424. On August 4, 2016, and August 9, 2016, Plaintiff discussed severe chronic pain and her hope to begin pain management treatment. R. at 424-25.

On September 13, 2016 and September 22, 2016, Plaintiff discussed an altercation with her sister-in-law, a cut on her arm, and bullying. R. at 602. She reported that she was seeking an order of protection against her sister-in-law. R. at 603. Plaintiff alleged that her in-laws kept calling child protective services with allegations against her for child neglect and drug use. R. at 602. On September 27, 2016, Plaintiff revealed she was diagnosed with lupus. *Id*. On September 29, 2016, Plaintiff discussed family issues with calling the police and physical problems. R. at. 603. Subsequent sessions on a similar matter were held on October 18, 2016 and October 25, 2016. R. at 604-05. On November 1, 2016, a treatment plan noted diagnoses of anxiety and depressive disorder. R. at 606. Subsequent sessions were held on November 15, 2016; November 29, 2016; December 13, 2016; and December 20, 2016. R. at 608-09.

Plaintiff was prescribed sertraline from April 27, 2016 through December 20, 2016 and bupropion from March 10, 2017 through May 8, 2017. R. at 427-28. Plaintiff was also prescribed topiramate from March 10, 2017 through April 8, 2017. R. at 427-29. A treatment plan consisting of sessions for Plaintiff were held on March 3, 2017 and March 10, 2017. R. at 615. On April 20, 2017, another treatment plan was formulated. R. at 624. Treatment sessions were

held on April 25, 2017 and May 9, 2017. R. at 627. Subsequent treatment sessions were held on

June 20, 2017; June 27, 2017; and July 11, 2017. R. at 628-29. Another treatment plan was

formulated with no changes on July 14, 2017. R. at 638.  Plaintiff's sessions for this treatment

plan were held on July 20, 2017 and July 25, 2017. R. at 641-42. A subsequent treatment plan

was formulated with no changes on October 7, 2017. R. at 644.

> v.    Deepesh Patel, M.D. – Primary Care Physician

Dr. Deepesh Patel ("Dr. D. Patel"), Plaintiff's primary care physician ("PCP"), saw

Plaintiff for her first visit on November 3, 2015. R. at 536. On August 25, 2016, Dr. D. Patel

submitted a treating source statement that revealed that he sees Plaintiff every three months for

sleep apnea, depression, low back pain, and joint pain. R. at 364. Dr. D. Patel noted that Plaintiff

is unable to bend due to weakness in her legs, and physical activity exacerbates her pain and

increases fatigue. *Id*. Among other laboratory findings, Dr. D. Patel noted that she has low

Vitamin D and a positive ANA test. R. at 365. Dr. D. Patel reported Plaintiff's leg weakness,

bilaterally, poor range of motion ("ROM"), positive straight leg raise, and subluxation of the

lumbar spine which has significant loss of ROM. R. at 365-67. Dr. D. Patel stated that Plaintiff

has moderate depression and sees a psychiatrist. R. at 368. Dr. D. Patel further noted that

Plaintiff sees rheumatologist Dr. U. Patel for conditions significant to recovery. R. at 370.

Plaintiff continued to see Dr. D. Patel on an ongoing basis. R. at 556. On January 8, 2018,

Plaintiff saw Dr. D. Patel for pain and medication refills. R. at 691. On January 16, 2018, Dr. D.

Patel examined Plaintiff for upper respiratory symptoms and made a diagnosis of acute upper

respiratory infection. R. at 695. On April 11, 2018, Dr. D. Patel saw Plaintiff for disability

paperwork related to lupus where Plaintiff admitted to dizziness, hair loss, dry skin, history of

seizures, depression, anxiety, fatigue and low back pain. R. at 696. Plaintiff was diagnosed for

lupus, low back pain, generalized anxiety disorder, and major depressive disorder. R. at 697. On May 11, 2018, Dr. D. Patel saw Plaintiff for an earache, dizziness, and vomiting. R. at 702. Plaintiff was diagnosed with allergic rhinitis and prescribed Benadryl. R. at 704. On November 2, 2018, Dr. D. Patel saw Plaintiff for medication review and noted no significant changes. R. at 707.

On November 29, 2018, Plaintiff saw Dr. D. Patel for a follow-up of blood tests. R. at 733. Dr. D. Patel noted irregular menstruation and pelvic and perianal pain. R. at 733, 738. On December 4, 2018, Plaintiff was seen for a pelvic ultrasound, which revealed left ovarian lesion. R. at 716. Dr. D. Patel recommended an MRI. R. at 716-17. On December 21, 2018, Plaintiff's pelvic MRI was normal. R. at 719.

vi.    Umesh Patel, M.D. – Rheumatologist

On May 31, 2016, Plaintiff saw rheumatologist Dr. U. Patel Patel ("Dr. U. Patel") at Arthritis and Rheumatic Pain Care to evaluate worsening of lower back pain with radiation to lower extremities. R. at 434. Plaintiff's spine was positive for stiffness and positive straight leg raises. R. at 432. Dr. U. Patel diagnosed Plaintiff with low back pain, other fatigue, pain in an unspecified joint, and arthralgia. R. at 432, 435. Plaintiff was prescribed Mobic. R. at 432-33. Plaintiff's lumbar spine X-rays revealed L5-S1 mild degenerative disc disease. R. at 446. On August 16, 2016, Dr. U. Patel saw Plaintiff again and prescribed Diclofenac. R. at 434-35.

On September 20, 2016, Plaintiff saw Dr. U. Patel for arthralgia with positive ANA. R. at 436. Dr. U. Patel diagnosed Plaintiff with lupus and prescribed medications. *Id*. Plaintiff's X-rays on June 6, 2016 were positive for mild lumbosacral degenerative joint disease at L5-S1. *Id*. On December 20, 2016, Dr. U. Patel diagnosed Plaintiff with chronic lower back pain/arthralgia. R. at 439. Plaintiff had a positive ANA test and was positive for Sjogren's syndrome (SS-B). R.

at 440. Dr. U. Patel noted that Plaintiff was to continue medications and routine blood testing. R. at 439-41.

On April 18, 2017, Dr. U. Patel saw Plaintiff and wrote that Diclofenac and Tylenol help with her pain. R. at 687. On July 19, 2017, Plaintiff saw Dr. U. Patel for lupus and chronic lower back pain radiating at times to lower extremities and with fatigue. R. at 448. Plaintiff continued with diagnosis of systemic lupus erythematosus, other specific abnormal immunological finings, and low back pain. R. at 449. Plaintiff continued to take Diclofenac and Plaquenil. R. at 450. On May 8, 2018, Dr. U. Patel saw Plaintiff for dizziness and vertigo that was not getting better. R. at 699-701. Dr. U. Patel noted Plaintiff's dizziness and vertigo to be side effects of medication. *Id*. On October 9, 2018, Dr. U. Patel saw Plaintiff for a follow-up visit. R. at 704. Plaintiff's impression remained as chronic low back pain, mild degenerative joint disease of lumbar spine, and arthralgia. R. at 704-707. Plaintiff was positive for Sjogren's syndrome and lupus. *Id*.

On April 17, 2018, Dr. U. Patel submitted a medical source statement indicating that he has been treating Plaintiff since May 31, 2016 for lupus. R. at 559. Dr. U. Patel reported that Plaintiff's prognosis for lupus was good. *Id*. Dr. U. Patel noted that Plaintiff's symptoms included depression, anxiety, fatigue, and arthralgia with pain throughout her body and 14/18 trigger points. *Id*. Dr. U. Patel noted that Plaintiff's depression and anxiety contribute to her physical condition. *Id*. He opined that at that time, Plaintiff could walk one to two city blocks without rest or severe pain, could sit 30 minutes at one time, and could stand 20-30 minutes at one time. R. at 559-60. Dr. U. Patel noted that Plaintiff could sit, stand, and walk less than two hours out of an eight-hour workday and would need a job that would permit shifting positions at will. R. at 560. Dr. U. Patel opined that Plaintiff would sometimes need to take frequent unscheduled breaks during a workday due to chronic fatigue, pain, and numbness. R. at 559-560.

12

Dr. U. Patel noted that Plaintiff could frequently lift less than ten pounds, occasionally lift twenty pounds, and occasionally climb stairs. R. at 561. Dr. U. Patel further indicated that Plaintiff would likely be off-task 20 percent of a workday, and her impairments were likely to produce good and bad days. R. at 562. Dr. U. Patel noted that Plaintiff would be absent from work for more than four days per month. *Id.*

   vii. Magen Pfister – Family Nurse Practitioner

   Plaintiff saw family nurse practitioner Magen Pfister ("FNP Pfister") on May 2, 2015 and was diagnosed with major depressive order-single episode. R. at 540. A CPAP machine to treat obstructive sleep apnea was ordered for Plaintiff on May 5, 2016. R. at 506. Plaintiff saw FNP Pfister on May 9, 2016 and May 20, 2016 regarding her sleep apnea. R. at 542, 545. On November 12, 2016, FNP Pfister followed up with Plaintiff after her Vassar Bros. ED visit due to forearm laceration. R. at 553-55.

   On April 16, 2018, FNP Pfister completed a medical source statement in which she noted Plaintiff had diagnoses of degenerative joint disease and lupus with a good prognosis. R. at 563. Symptoms included daily low back pain radiating into legs with lifting and bending, fatigue, and decreased lumbar spine. *Id.* FNP Pfister noted that depression and anxiety affected her physical condition. R. at 566. FNP Pfister noted that Plaintiff could walk two city blocks without rest or severe pain, could sit for 30 minutes at one time, and could stand for 30 minutes at one time. R. at 563-64. FNP Pfister further opined that Plaintiff could sit, stand, and walk less than two hours each in an eight-hour workday and would need a job that permits shifting at will. *Id.* FNP Pfister opined that Plaintiff needed to include periods of walking around during an eight-hour workday, specifically noting Plaintiff must walk every 30 minutes for five minutes. R. at 564. FNP Pfister

noted that Plaintiff would need to take unscheduled breaks every two hours for 15 minutes due to muscle weakness, chronic fatigue, pain, and numbness. *Id*.

FNP Pfister reported that with prolonged sitting, Plaintiff's legs should be elevated above the heart and for 50 percent of the workday due to edema. R. at 564-65. FNP Pfister noted that Plaintiff can occasionally lift and carry up to ten pounds and occasionally climb stairs. R. at 565. FNP Pfister noted that Plaintiff's work stress reactions would be triggered by increased workload, and increased anxiety would result, due to a history of anxiety and depression. R. at 566. FNP Pfister noted that her symptoms are likely to produce good and bad days, and Plaintiff would likely be absent from work for more than four days per month. *Id*. FNP Pfister further noted Plaintiff's lupus resulted in intolerance to temperature changes, blurry vision, low blood pressure, and vertigo. *Id*.

### C.  Medical Opinion Evidence

#### i.    George Wootan, M.D. – Internal Medicine Examination

Dr. George Wootan ("Dr. Wootan") conducted an internal medicine examination of Plaintiff on September 6, 2016, which revealed Plaintiff's lumbar spine showed 45 degrees of flexion, 20 degrees of extension and 25 degrees squat. R. at 375-76. Dr. Wootan reported that Plaintiff's lumbar spine and shoulder ROM were both reduced and knees had limited flexion. *Id*. Dr. Wootan also reported that Plaintiff had two trigger points in trapezius, posteriorly, her left hip and one at both of her elbows. R. at 377. Dr. Wootan diagnosed Plaintiff with arthritis in her back, hypertension, sleep apnea, and fibromyalgia with fair prognosis. *Id*. Dr. Wootan noted that Plaintiff would have mild restrictions reaching, kneeling, bending, climbing stairs, walking, and standing. *Id*. Dr. Wootan further noted that Plaintiff would have moderate restrictions carrying

and lifting and no restrictions with sitting. R. at 377-78. A lumbosacral spine X-ray revealed mild degenerative disc disease at L5-S1. R. at 379.

> ii.     Meghan Lynch, Psy.D. – Psychiatric Evaluation

Dr. Meghan Lynch ("Dr. Lynch") conducted a psychiatric evaluation of Plaintiff on September 6, 2016, in which she noted that Plaintiff had, at that time, been in psychiatric treatment for six months every other week and takes Sertraline for depression. R. at 382-83. Dr. Lynch reported a pattern of domestic abuse by Plaintiff's sister-in-law and mother-in-law for which Plaintiff ultimately sought an order of protection. She endorsed excessive worry and fearfulness of being assaulted by her in-laws. R. at 383. Dr. Lynch noted that Plaintiff's posture was slouched, affect distraught with profuse tearfulness, and was sobbing throughout the interview when describing bullying and physical abuse. *Id*. Dr. Lynch further noted that Plaintiff's recent memory skills were mildly impaired due to emotional distress, intellectual functioning appeared below average, and judgment was poor. R. at 384-85. Dr. Lynch diagnosed Plaintiff with post-traumatic stress disorder ("PTSD"), acute stress disorder, unspecified depressive disorder, specific learning disorder, and dyslexia. R. at 384. Dr. Lynch reported that Plaintiff had marked limitation in her ability to relate adequately with others, to appropriately deal with stress, and to make appropriate decisions due to her PTSD and depression. R. at 385-87. Dr. Lynch added that there is no evidence of limitation in Plaintiff's ability to follow and understand simple directions and instructions, to maintain attention and concentration, to learn new tasks, and to perform complex tasks independently. R. at 386. A domestic violence hotline was contacted and Plaintiff was assigned an advocate to assist her with safety concerns and link her with domestic violence services. R. at 386. Dr. Lynch noted Plaintiff's prognosis as fair. R. at 387.

        iii.     Clayton Walker, Ph.D. – State Agency Psychologist

State agency psychologist Dr. Clayton Walker ("Dr. Walker") assessed that there is not sufficient evidence relevant to establish that Plaintiff has a severity of impairments and work-related limitations. R. at 95. Dr. Walker concluded that Plaintiff could understand and remember work procedures, could maintain adequate attention and concentration to complete work-like procedures and sustain a routine although she could not deal with stress. R. at 86. Dr. Walker noted that all potentially applicable Medical-Vocational Guidelines would direct a finding of "not disabled" given Plaintiff's age, education, and RFC. *Id*. Dr. Walker opined that Plaintiff could adjust to other work. *Id*.

## APPLICABLE LEGAL STANDARDS

### I.   Judicial Review of the Commissioner's Determination

A district court reviews a Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c)(3) to determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard. *Talavera v. Astue*, 697 F.3d 145, 151 (2d Cir. 2012). "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted)).

The substantial evidence standard means that once an ALJ finds facts, a district court can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault v. SSA*, 683 F.3d 443, 448 (2d Cir. 2012) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)). In other words, this Court must afford the Commissioner's determination considerable deference, and may not "substitute its own judgment for that of the [Commissioner], even if it

might justifiably have reached a different result upon a de novo review." *Jones v. Sullivan*, 949

F.2d 57, 59 (2d Cir. 1991) (internal quotation marks and citation omitted).

## II.   Commissioner's Determination of Disability

### A.  Definition of Disability

A disability, as defined by the Social Security Act, is one that renders a person unable to

"engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A)

*accord* 42 U.S.C. § 1382c(a)(3)(A). Further, "[t]he impairment must be 'of such severity that

[the claimant] is not only unable to do his previous work but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy." *Shaw v. Chater*, 221 F.3d 126, 131-32 (2d Cir. 2000) (quoting

42 U.S.C. § 423(d)(2)(A)). Proof of disability can be gleaned from several factors: objective

medical facts; diagnoses or opinions based on these facts; subjective evidence of pain and

disability testified to by claimant and family members or others; and claimant's educational

background, age, and work experience. *See Marcus v. Califano,* 615 F. 2d 23, 26 (2d Cir. 1979);

*Bastien v. Califano,* 575 F. 2d 908, 912 (2d Cir. 1978).

### B.  The Commissioner's Five-Step Analysis of Disability Claims

The Commissioner uses a five-step process to determine whether a claimant has a

disability within the meaning of the Social Security Act. 20 C.F.R. § 404.1520(a)(4)*.* First, the

Commissioner determines whether the claimant is currently engaged in substantial gainful

activity. *Id*. § 404.1520(a)(4)(i). If so, the Commissioner will consider the claimant not to be

disabled. *Id.* Second, if the claimant is not engaged in substantial gainful activity, the

17

Commissioner considers whether the claimant has a "severe medically determinable physical or mental impairment" or combination of impairments that meets the duration requirement of a continuous period of 12 months. *Id.* § 404.1520(a)(4)(ii); *see also id.* § 404.1509 (establishing duration requirement). Third, if the claimant suffers from such an impairment, the Commissioner determines whether that impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of the Social Security Act regulations. *Id.* § 404.1520(a)(4)(iii); *see also id.* § Pt. 404, Subpt. P, App'x 1. If the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's impairment, she has the residual functional capacity ("RFC") to perform her past work. *Id.* § 404.1520(a)(4)(iv). Finally, if the claimant is unable to perform her past work, the Commissioner determines whether there is other work which the claimant could perform. *Id.* § 404.1520(a)(4)(v).

"The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and 'bears the burden of proving his or her case at steps one through four.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal citations omitted). At step five, however, "the burden shifts to the Commissioner to show that there [are] a significant number of jobs in the national economy that [the claimant] could perform based on his residual functional capacity, age, education, and prior vocational experience." *Butts v. Barnhart*, 388 F.3d 377, 381 (2d Cir. 2004) (citing 20 C.F.R. § 404.1560).

i.   Special Technique in Mental Health Cases

In addition to this five-step process, when evaluating "the severity of mental impairments," the ALJ must apply a "special technique" during steps two and three. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (citations omitted). This technique "requires the reviewing authority to determine first whether the claimant has a 'medically determinable mental

18

impairment.'" *Id.* at 265-66.  If the claimant "is found to have such an impairment, the reviewing authority must 'rate the degree of functional limitation resulting from the impairment(s)" in "four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation." *Id.* at 266 (citing 20 C.F.R. § 404.1520a). Paragraph B of each Medical Listing "sets forth the minimum necessary finding for that particular impairment in each of the four § 404.1520a functional areas." *Fait v. Astrue*, No. 10-5407, 2012 WL 2449939, at *5 (E.D.N.Y. June 27, 2012).

Under the regulations, "if the degree of limitation in each of the first three areas is rated 'mild' or better, and no episodes of decompensation are identified, then the reviewing authority generally will conclude that the claimant's mental impairment is not 'severe' and will deny benefits." *Kohler*, 546 F.3d at 266.  If the mental impairment is determined to be "severe," then the ALJ will "compare the relevant medical findings and the functional limitation ratings to the criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder." *Id.* "Importantly, the regulations require application of this process to be documented." *Id.* (citing 20 C.F.R. § 404.1520a (e)). The ALJ's written decision must "reflect application of the technique," and it "*must* include a specific finding as to the degree of limitation in each of the functional areas" described above. *Id.*

### C.  The ALJ's Decision

*First*, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity ("SGA") since the alleged onset date of November 15, 2015. R. at 12.

*Second*, the ALJ determined that Plaintiff had the severe impairments of lupus, fibromyalgia, degenerative disc disease of the lumbar spine, PTSD, stress disorder, dyslexia, and depressive disorder. *Id*. The ALJ found that Plaintiff's hypertension, sleep apnea, left forearm

laceration, status post arm injuries, neck injuries, head injuries, hematochezia, abdominal pain, reflux esophagitis, hemorrhoids, and ovarian cysts non-severe largely due to a lack of documented complications resulting from those impairments. R. at 13-15. The ALJ also determined that Plaintiff's obesity does not cause more than minimal vocational limitations. *Id*.

*Third*, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 after considering the listings at §§ 1.02, 1.04, 12.02, 12.04, and 14.02. R. at 14. Furthermore, the ALJ determined that Plaintiff's mental impairments do not satisfy the "Paragraph B" criteria. R. at 14. After reviewing the medical evidence of record, the ALJ decided Plaintiff's mental impairments did not result in at least one extreme or two marked limitations in a broad area of functioning. *Id*. The ALJ affixed an RFC for light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.927(b) with additional exertional and non-exertional limitations. R. at 16.

*Fourth*, the ALJ concluded that Plaintiff was unable to perform past relevant work. R. at 22.

*Fifth and finally*, following the VE testimony, the ALJ determined that there were jobs available in the national economy that Plaintiff could perform. R. at 23-24. After evaluating the record, the ALJ concluded that Plaintiff was not disabled under the Social Security Act through the date of the decision. R. at 24.

## **DISCUSSION**

Plaintiff seeks remand for further administrative proceedings, contending that the ALJ's determination that she was not disabled was erroneous. Plaintiff moves on three primary grounds: (1) the ALJ erred in analyzing the medical and other evidence of record; (2) the ALJ's

RFC statement is not supported by substantial evidence; and (3) the ALJ erred in not determining that Plaintiff is capable of less than sedentary work. The Court holds that the final decision was supported by substantial evidence and therefore not erroneous.

## I.   The ALJ's RFC Determination is Supported by Substantial Evidence

A plaintiff's residual functional capacity ("RFC") "is the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a). The ALJ "[is] entitled to weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole." *Matta v. Astrue*, 508 Fed.Appx. 53, 56 (2d Cir. 2013) (summary order) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971)). The ALJ determined that Plaintiff was unable to perform any past relevant work, but, after evaluating the entire record, that she had the RFC to perform light work with some limitations. R. at 16. The Court holds that the RFC determination is supported by substantial evidence and that, contrary to Plaintiff's assertions, the ALJ properly weighed the medical opinion evidence and properly evaluated her physical and mental impairments— including subjective statements—in formulating a RFC.

### A.  The ALJ Properly Weighed the Medical and Other Evidence in the Record

Plaintiff argues that the ALJ violated the treating physician rule[2] by giving little weight to the treating physician opinions from Dr. U. Patel, Dr. D. Patel, and FNP Pfister. More specifically, she states that the ALJ erroneously gave significant weight to the opinions of non-examining State agency consultant Dr. Clayton Walker "whose opinion was rendered early in the disability review process, and who reached his conclusions on the basis of an incomplete record." Pl.'s Mot. at 16-17 (citation omitted). Plaintiff also asserts that the ALJ cherry-picked findings from treatment notes where doctors had documented normal or near-normal functioning

---

[2] The Parties do not dispute that the treating physician rule governs this case, and her claims were filed prior to March 27, 2017.

and ignored abnormalities. Plaintiff contends that the treating source opinions "should have been given primacy in the ALJ's evaluation of the medical evidence." Pl.'s Mot. at 19.

      i.   Treating Physicians' Opinions

Under the treating physician rule, the opinion of a plaintiff's treating physician is afforded "controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *Burgess*, 537 F.3d at 128 (internal citations and quotation marks omitted). "Generally, the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with . . . the opinions of other medical experts, for genuine conflicts in the medical evidence are for the Commissioner to resolve." *Id.* (internal citations and quotation marks omitted). An ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Crowell v. Comm'r of Soc. Sec. Admin.*, 705 Fed.Appx. 34, 35 (2d. Cir. 2017) (summary order) (quoting *Burgess*, 537 F.3d at 128) (internal quotation marks omitted). Under *Burgess*, the ALJ must decide whether a treating physician's medical opinion merits "controlling weight," and if it does not, then "determine how much weight, if any, to give it" based on certain factors. *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019). "[T]he ALJ must explicitly consider several factors in determining the proper weight to assign, including: "(1) the frequen[c]y, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist (the '*Burgess factors*')." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess*, 537 F.3d at 129 (2d Cir. 2008)).

Upon review of the ALJ's decision, the Court concludes that the ALJ did not err in declining to assign controlling weight to the treating physician opinions.

The ALJ explained that Dr. U. Patel's opinion was entitled to "little weight" because it was "inconsistent with the vast bulk of his clinical findings about the claimant." R. at 19. The ALJ further explained that "the records from Axis Medical, where Dr. Patel practices . . . show that the claimant displayed stiffness in her lower back, positive straight leg rai[s]ing, and pain with walking on four occasions" but that the "records also show that her upper and lower extremities were negative for joint tenderness and that they displayed full range of motion and strength." R. at 18-19. The ALJ also reasoned that her records from Axis Medical "show[ed] that her reflexes sensation were normal during . . . examinations" and ultimately show that "all of Dr. [U.] Patel's clinical evaluations of the claimant were completely normal . . . since December 2016." R. at 19. The ALJ further concluded that his opinion was inconsistent with other evidence in the record since December 2016. R. at 19.

The ALJ also gave "little weight" to FNP Pfister's opinion largely for the same reason: inconsistency with her own clinical findings. The ALJ explained that the Axis Medical records, where FNP Pfister practices, showed that Plaintiff showed normal examinations and that her opinion was rendered "more than a year and a half since [she] had actually examined the claimant" and thus "did not possess a strong longitudinal understanding of the claimant's history and symptoms at the time she rendered them." R. at 19.

The ALJ decided to accord "little weight" to the opinion of Dr. D. Patel because it was inconsistent with the vast bulk of his clinical findings. Specifically, the ALJ stated that the Axis Medical records from November 30, 2015 through January 15, 2019 showed "only one abnormal

clinical finding, which [was] a loss of motion with bending," but the remainder of the records were "completely normal." R. at 20.

The ALJ's decision to accord little weight to the treating source opinions is supported by substantial evidence for Dr. U Patel. *See* 6F pp. 18-19 R. at 450-51 (observing normal left lower and upper extremity range of motion and strength without joint tenderness); R. at 432, 435, 437, 439 6F 1, 3, 5, 7 (noting normal reflexes and sensations as well as intact memory); R. at 451 6F at 19 (noting no memory loss and clean, neat appearance during examination); 14F 15, 18 R. at 702, 705 (noting normal clinical evaluations from December 2016 through October 2018). The ALJ decision to give FNP Pfister's opinion little weight is similarly well-supported. *See* 7F pp. 83-84, 90, 93, 95-96, 98, 101, 104 – R. at 535-36, 542, 545, 547-48, 550, 553, 556 (noting that examinations occurring throughout 2016 were normal). The ALJ did not err in giving little weight to Dr. D Patel's treating source opinion either. *See* 6F, 7F, 14F, 15F R. at 432-451, R. at 452-558, R. at 687-712, R. at 713-743 (noting multiple normal clinical evaluations). *But see* R. at 699 (observing loss of motion with bending).

Upon review of the medical evidence, it is true that some treatment history noted some abnormalities, which the ALJ acknowledges, but the ALJ nonetheless determined that the treating source opinions were inconsistent with the bulk of clinical findings. *See Camille v. Colvin*, 652 Fed.Appx. 25, 27 (2d Cir. 2016) ("Substantial evidence supports the limited weight that the ALJ attributed [to the treating source opinions] because they were in conflict with content in that doctor's own clinical notes.") (footnote omitted). When determining whether to give controlling weight to a treating source opinion, "genuine conflicts in the medical evidence are for the Commissioner to resolve." *Burgess*, 537 F.3d at 128 (internal citations and quotation marks omitted). Contrary to Plaintiff's contentions, the ALJ did not cherry-pick medical

findings. Rather, the ALJ identified and then resolved the genuine conflicts in the medical evidence. It is not erroneous for the ALJ to give less weight to treating source opinions when the record indicates that Plaintiff is generally stable or showing improvement. *See Rosier v. Colvin*, 586 Fed.Appx. 756, 758 (2d Cir. 2014) (summary order) (ALJ properly discounted treating physician's opinion because treatment records showed improvement); *Cohen v. Comm'r of Soc. Sec.*, 643 Fed.Appx. 51, 53 (2d Cir. 2016) (summary order) (same). In short, the ALJ did not err in giving less weight to the treating source opinions when determining that Plaintiff was not disabled.

    ii.    Non-Examining State Agency Expert Opinion

The ALJ supported the RFC determination of capacity for light work with information about psychiatric limitations from non-examining state agency expert, Dr. Walker. R. at 22. Plaintiff advances an argument, albeit cursorily, that the ALJ erred when it gave "significant weight" to the non-examining state agency expert, Dr. Walker, because there was no indication of his specialty area or whether he was a doctor, that he rendered his opinions without ever examining Plaintiff, and that his opinions relied on an incomplete record. Pl.'s Mot. at 16-17 (citation omitted). The Court disagrees.

At the outset, the ALJ did not err in considering Dr. Walker's opinion because he is a highly qualified expert and independent reviewer for disability applications under the Social Security Act. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e)(2). As Defendant notes, the record indicates that he is a "Ph.D.," and the Court takes judicial notice of publicly available proof of his active license as a state-certified psychologist in New York. This is a "matter[ ] of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Because Dr. Walker appears to have the proper professional license and other

credentials, he is qualified to provide a consultative opinion in his capacity as a licensed psychologist. *Cf. Tim v. Colvin*, No. 6:12-CV-1761 GLS/ESH, 2014 WL 838080, at *8 (N.D.N.Y. Mar. 4, 2014).

It is well-established that a consultative opinion may constitute substantial evidence if otherwise supported by the record. *Grega v. Saul*, 816 Fed.Appx. 580, 582-83 (2d. Cir. 2020) (summary order) (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983)). Non-examining, consultative opinions can "override treating sources' opinions provided they are supported by evidence in the record." *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995).

Here, the ALJ determined that the opinion of Dr. Walker was entitled to "significant weight" because it was consistent with other evidence in the record. R. at 22. Dr. Walker prepared opinions on September 21 and September 28, 2016, and the ALJ gave them more weight because Walker was an "independent reviewer" and "his opinions [were] consistent with remaining evidence of record." R. at 22. His September 21, 2016 opinion indicated that Plaintiff had some limitations in understanding and memory, sustaining concentration and persistence, interacting with the public, accepting instructions, setting realistic goals, responding to supervisory criticism, and responding appropriately to workplace changes. R. at 21. It also noted, however, that she had no limitations in traveling to unfamiliar places/using public transportation, being aware of normal hazards, getting along with work colleagues, maintaining appropriate social behavior, asking simple work questions, making simple work-related decisions, sustaining a work routine without supervision, carrying out and remembering short and simple instructions, and remembering locations and work-like procedures. R. at 21. The September 28, 2016 consultative opinion was substantially similar. R. at 21. It added that Plaintiff had no limitation in her daily activities and no repeated episodes of decompensation of an extended period. R. at

22. These opinions are consistent with the rest of the record, including Plaintiff's testimony about daily activities and her largely stable condition in more recent treatment history (as discussed *supra*). Aside from the various treating source opinions that the ALJ properly gave little weight, Plaintiff does not point to any other specific evidence that the ALJ overlooked in making this determination. Therefore, the ALJ did not err by assigning significant weight to these portions of Dr. Walker's opinions.

Overall, the treating physicians' opinions are inconsistent with the record on the whole. The Court therefore concludes that the ALJ properly weighed those opinions in making an RFC determination.

### B.  The ALJ Properly Evaluated Plaintiff's Severe and Non-Severe Mental and Physical Impairments in Formulating the RFC

Plaintiff argues that the ALJ failed to consider the combination of Plaintiff's impairments—severe and non-severe, physical and mental. She specifically contends that the ALJ did not account for her difficulty walking and standing, significant daily fatigue, digestive problems that "require her to constantly know the location of the nearest toilet," full body pain every day, sleep apnea, inability to plan, and anxiety and depression. Pl.'s Mot. at 20. Plaintiff states that the ALJ should have found that she was incapable of participating in sedentary work. The Court disagrees.

When making an RFC assessment, the ALJ must consider "functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." *Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8P (S.S.A. July 2, 1996) (henceforth, "SSR 96-8P"). "The RFC assessment must first identify the individual's functional limitations or

restrictions and assess his or her work-related abilities on a function-by-function basis." *Id.;*
*Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013). These functions include physical (standing,
sitting, walking, lifting, carrying, pushing, pulling), mental (understanding, remembering,
carrying out instructions, and responding to supervision), and other abilities that may be affected
by impairments (seeing, hearing, ability to tolerate environmental factors). *See* SSR 96-8P; *see
also* 20 C.F.R. § 404.1545(b)-(d); 20 C.F.R. § 416.945; *Cichocki*, 729 F.3d at 176. "RFC is not
the *least* an individual can do despite his or her limitations or restrictions, but the *most*." SSR 96-
8P.

  An ALJ "has the discretion to evaluate the credibility of a claimant and to arrive at an
independent judgment . . . in light of medical findings and other evidence, regarding the true
extent of the pain alleged by the claimant." *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)
(internal citation omitted). The intensity and persistence of the claimant's symptoms must be
evaluated based on all the available evidence. *See* 20 C.F.R. §§ 404.1529(a)-(c) and 416.929(a)-
(c). Additionally, if an individual alleges impairment-related symptoms, ALJs must:

> First . . . consider whether there is an underlying medically determinable physical
> or mental impairment(s) that could reasonably be expected to produce an
> individual's symptoms, such as pain. Second, once an underlying physical or
> mental impairment(s) that could reasonably be expected to produce an individual's
> symptoms is established, . . . evaluate the intensity and persistence of those
> symptoms to determine the extent to which the symptoms limit an individual's
> ability to perform work-related activities . . .

SSR 16-3p (S.S.A.), 2016 WL 1119029 (hereinafter, "SSR 16-3p"). ALJs are only required to
discuss factors that are "pertinent to the evidence of record." *Id*.

  Here, the ALJ properly evaluated Plaintiff's functional limitations and restrictions
resulting from a combination of impairments. The ALJ overall found that Plaintiff's alleged loss
of functioning was not supported by the record. R. at 22. Examining the evidence as a whole, the

ALJ found that Plaintiff's impairments could reasonably be expected to cause the alleged symptoms but that her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." R. at 16. With respect to mental impairment, for example, the ALJ determined that Plaintiff consistently showed that she suffered from anxiety through the alleged onset date. R. at 17. However, Plaintiff was "inconsistent and not compliant throughout treatment," having missed "multiple appointments by not showing up after calling to confirm and by frequently calling and rescheduling." R. at 17-18. Considering the factors set forth in 20 C.F.R. § 404.1529, 20 C.F.R. § 416.929, and SSR 16-3p, the ALJ reasoned that "the statements made by the claimant concerning the severity of her symptoms and the extent of her limitations [were] generally not consistent with the medical record as a whole." R. at 22. The ALJ noted that the clinical findings did not support the nature and severity of symptoms reported by the claimant and that, despite her physical pain and mental limitations, further examination and her daily activities demonstrated "a lack of motor impairment, muscle loss, tears, muscle swelling, impaired sensations, impaired memory, and memory loss." *Id*. The ALJ further reasoned that Plaintiff had mentioned "a broad range of daily living activities" that she could perform, including caring for her children, shopping, handling money, and driving. *Id*. As discussed above, the ALJ gave little weight to the various treating physicians' opinions, which the ALJ thoroughly explained were poorly supported based on their own clinical findings. *Id.* Lastly, the ALJ concluded that physical limitations were supported by Dr. Wootan's opinions, and psychiatric limitations by opinions from Dr. Lynch and Dr. Walker. *Id*. Ultimately, the ALJ decided that the totality of the evidence pointed toward a capacity for light work. *Id*.

Having considered the record evidence in its entirety, the Court holds that the ALJ's determination that Plaintiff is not disabled and has the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c) is supported by substantial evidence.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for judgment on the pleadings is **DENIED**. Defendant's cross-motion is **GRANTED**. The Clerk of Court is respectfully directed to terminate this case.

**SO ORDERED.**

Dated: March 31, 2022

      New York, New York

                                      **ANDREW L. CARTER, JR.**
                                      **United States District Judge**